**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BRUCE BEAL, et al.,      ) | |
|      ) | |
|     Plaintiffs,   ) | |
|      ) | Case No.  04 C 2039 |
|   v.     ) | |
|      ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, SUPERINTENDENT   ) | |
| PHILLIP J. CLINE, TERRY G. HILLARD   ) | |
| COMMANDER JOHN R. RISLEY,   ) | |
| DEFENDANTS DOE 1-50, DEFENDANTS   ) | |
| DOE 51-100, CPO BILYJ, CPO HERRERA,   ) | |
| CPO LAMPERIS, CPO COLLIER, CPO   ) | |
| O'CONNOR, and DEFENDANTS ROE 1-50   ) | |
|      ) | |
|     Defendants.   ) | |

## MEMORANDUM OPINION AND ORDER

Sixteen Plaintiffs ("Plaintiffs") bring this action against the City of Chicago ("the City");

Chicago Police Department ("CPD") Deputy Superintendent Phillip J. Cline, Superintendent Terry

G. Hillard and Commander John R. Risley ("Command Personnel");[1] CPD officers Bilyj, Herrera,

Lamperis, Collier and O'Connor ("Officers");[2] and unnamed Defendants Doe and Roe – collectively,

"Defendants."  Plaintiffs seek money damages and injunctive relief for Defendants' actions related

to the war protest march that occurred in Chicago on March 20, 2003.  Against the CPD Command

Personnel and Officers, Plaintiffs assert claims under 42 U.S.C. § 1983 for wrongful arrest, wrongful

imprisonment, violation of First Amendment rights and conspiracy; and under Illinois law for

---

[1] Certain of the Command Personnel have been promoted within the CPD or resigned from the CPD since March 20, 2003, but for purposes of this opinion and order they are referred to by the rank they held on March 20, 2003.

[2] Plaintiffs do not oppose dismissal of Officers Colyar (Collier in the case's caption) and O'Connor.

violation of the State Constitution, false arrest, false imprisonment, malicious prosecution and civil conspiracy. Against the City of Chicago, Plaintiffs assert a *Monell* policy and practice claim under § 1983 and state law claims of respondeat superior and for indemnification under 745 ILCS § 10/9-102. Against Defendants Doe and Roe, Plaintiffs assert § 1983 claims for unreasonable and punitive conditions of confinement, excessive force and assault and battery.

Each Defendant has moved for summary judgment on all claims. Because genuine issues of fact exist as to whether the marchers became violent or obstructive and whether Defendants gave Plaintiffs fair notice to disperse and an opportunity to comply, summary judgment is denied as against Plaintiffs' claims for wrongful arrest, wrongful imprisonment and a violation of First Amendment rights under § 1983 and state law. Plaintiffs' malicious prosecution claim is dismissed as to all Defendants. As to Deputy Superintendent Cline, the claim is dismissed because he committed no further improper acts beyond the allegedly unlawful arrest. As to the remainder Defendants, Plaintiffs have not identified disputed material facts from which a reasonable juror could find that they played a significant role in causing the prosecution. On Plaintiffs' civil conspiracy claim, summary judgment is granted because no reasonable juror could infer from the circumstances that Defendants reached "a meeting of the minds." As to the City of Chicago, Plaintiffs' § 1983 claim is dismissed because Plaintiffs have not identified a policy or custom that caused them an injury under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). The state law claims of respondeat superior and for indemnification under 745 ILCS § 10/9-102 are not dismissed, however, because they do not require proof of a policy or custom for municipal liability to attach, nor must Plaintiffs sue the individual officers in order for the City to incur liability on these claims. Last, all claims against Defendants Doe and Roe are dismissed as barred by the statute of limitations.

2

**Background**

On March 20, 2003, at approximately 5:00 p.m., a rally was held at the Federal Plaza in Chicago, Illinois. (Plfs.' 56.1, ¶ 1.)[3] The rally's purpose was to protest the war in Iraq. (*Id.*) After the rally at Federal Plaza, the demonstrators began a march through the streets of downtown Chicago. (Plfs.' 56.1, ¶ 2.) Plaintiffs, with the exception of Jody Gronborg and perhaps Charles Kam, participated in the march. (Plfs.' 56.1, ¶ 3.) The demonstrators did not obtain a permit to march. (DPOs' 56.1, ¶ 11.)[4] Nevertheless, Commander Risley anticipated a march would follow the rally and conversed with march leaders regarding a possible route so that traffic and safety concerns could be addressed. (DPOs' 56.1, ¶¶ 11-12.) Commander Risley suggested that the march proceed north on Dearborn Street and the CPD arranged to shut down Dearborn traffic. (DPOs' 56.1, ¶¶ 13-14.) Instead, the marchers left the Federal Plaza in two groups – one group marched east on Jackson Street and the other group marched east on Adams Street. (DPOs' 56.1, ¶¶ 20-23.) The two groups joined near the intersection of Michigan and Monroe, and the combined group marched east on Monroe. (DPOs' 56.1, ¶ 24.) Commander Risley deployed officers at several intersections in an attempt to block the marchers from reaching Lake Shore Drive. (DPOs' 56.1, ¶ 26.) As the march headed east on Monroe, Commander Risley spoke with his mounted commander, who controlled a group of CPD officers on horseback, and determined that the CPD could no longer hold the line preventing the crowd from proceeding to Lake Shore Drive. (DPOs' 56.1, ¶¶ 29-31.) Commander Risley then allowed the marchers onto Lake Shore Drive. (DPOs' 56.1, ¶ 32; Plfs' 56.1,

---

[3] Defendants' Response to Plaintiffs' Statement of Facts in Response to Defendants' Motions for Summary Judgment.

[4] Plaintiff's Response to Revised Individually-Named Defendant Police Officers' LR 56.1(A)(3) Statement of Uncontested Material Facts.

3

¶ 5.) The protestors marched up both the northbound and southbound lanes of Lake Shore Drive. (DPOs' 56.1, ¶¶ 43-44.) Police had stopped northbound traffic on Lake Shore Drive at Monroe. (DPOs' 56.1, ¶ 38.) The marchers filled the southbound lanes blocking traffic. (DPOs' 56.1, ¶¶ 43-44.) Superintendent Hillard gave two direct orders: first, he ordered his officers to keep the marchers in the northbound lanes of Lake Shore Drive and, second, he ordered that the "Magnificent Mile" – the shopping district along Michigan Avenue – be protected from damage. (DPOs' 56.1, ¶ 179.)

Commander Griffin made his way to the front of the march and formed a skirmish line at Grand and Lake Shore Drive in the northbound lanes. (DPOs' 56.1, ¶ 47.) During this time, Commander Griffin maintained a dialogue with a self-identified leader. (DPOs' 56.1, ¶ 57.) Commander Griffin stated that the march could continue north on Lake Shore Drive if the marchers agreed to stay in the northbound lanes and agreed not to exit before North Avenue. (DPOs' 56.1, ¶¶ 59-64, 69-70.) When the crowd reached Oak Street, some of the marchers broke off and started heading west. (DPOs' 56.1, ¶ 74.) When the demonstrators reached the corner of Oak and Michigan, they came face-to-face with a skirmish line of police. (DPOs' 56.1, ¶ 81; Plfs' 56.1, ¶ 6.) Commander Griffin, Commander Risley, Deputy Chief Radke, Deputy Superintendent Byrne and Superintendent Cline met and decided that someone should speak with the protestors. (DPOs' 56.1, ¶ 82.) Commanders Griffin and Risley met with Andy Thayer and others that represented themselves to be march leaders, including the individual that Commander Griffin had spoken with on Lake Shore Drive. (DPOs' 56.1, ¶¶ 83-84.) The "march leaders" insisted that they wanted to march on Michigan Avenue. (DPOs' 56.1, ¶¶ 85, 88, 90-91.) Commanders Griffin and Risley told them that they could not march on Michigan Avenue, but that they would take them back down Lake Shore Drive to the Federal Plaza. (DPOs' 56.1, ¶ 87, 89.) Commanders Griffin and Risley also told the

4

"march leaders" that if they did not go down Lake Shore Drive the marchers would need to disperse or be arrested. (DPOs' 56.1, ¶¶ 87, 89, 92.) The crowd turned around and headed east towards Lake Shore Drive. (DPOs' 56.1, ¶ 94; Plfs.' 56.1, ¶ 7.)

According to Defendants, when the CPD got the marchers back to the Inner Drive, the mounted unit formed a skirmish line from north to south blocking Walton (the street one block south of Oak). (DPOs' 56.1, ¶ 100.) Commander Griffin repeated the warning that the marchers could not go down Michigan Avenue or they would be arrested, he received no response from the crowd. (DPOs' 56.1, ¶ 103.) A group of the protestors unsuccessfully attempted to get through the skirmish line at Walton and head back towards Michigan Avenue. (DPOs' 56.1, ¶ 104.) The protestors then went south on the Inner Drive and tried to get past the skirmish lines at Delaware and Chestnut. (DPOs' 56.1, ¶¶ 105-06, 108.) Finally, some protestors went farther south and turned west towards Michigan Avenue on Pearson and Chicago, which were not covered by police. (DPOs' 56.1, ¶¶ 109-11.) Superintendent Cline ordered a skirmish line set up at Chicago and Michigan. (DPOs' 56.1, ¶¶ 116, 161.) When Commander Griffin arrived he saw the skirmish line at Chicago and Michigan. (DPOs' 56.1, ¶ 117.) Commander Griffin asked Commander Charles Williams to position police east of the protestors on Chicago Avenue to prevent the marchers from running out the back. (DPOs' 56.1, ¶ 120.)

According to Plaintiffs, Lt. Oliver and his mounted unit accompanied the demonstrators east on Oak Street to the Inner Drive. (Plfs.' 56.1, ¶ 493.) The crowd headed south on the Inner Drive while officers prevented people from going back west down the side streets off the Inner Drive – e.g., Walton, Delaware, Chestnut and Pearson. (Plfs. 56.1, ¶ 494-96.) When the march reached the intersection of the Inner Drive and Chicago Avenue, the police blocked off all routes which would

allow the marchers to proceed farther south or to go in any direction except west on Chicago Avenue. (Plfs.' 56.1, ¶¶ 8, 497.) The marchers, including Plaintiffs, proceeded west on Chicago Avenue, where they were stopped by a wall of police blocking the west end of Chicago Avenue at Michigan Avenue. (Plfs.' 56.1, ¶ 9.) After Plaintiffs were stopped on Chicago Avenue the police formed another wall at Chicago Avenue and Mies van der Rohe Way preventing any of them from leaving. (Plfs.' 56.1, ¶¶ 10, 504-05.)

Commander Griffin began ordering the arrests of marchers surrounded on Chicago Avenue between Mies van der Rohe Way and Michigan Avenue. (DPOs' 56.1, ¶¶ 119, 121.) The CPD arrested all Plaintiffs, except Jodi Gronborg, at this location. (Plfs.' 56.1, ¶ 11.) Deputy Superintendent Cline and Chief of Patrol Maurer arrived after several minutes of arrests. (DPOs' 56.1, ¶ 125.) Deputy Superintendent Cline estimated that 500 arrest were made. (DPOs' 56.1, ¶ 137.) After these arrests were made, Deputy Superintendent Cline and Chief of Patrol Maurer testified that the CPD gave the other marchers surrounded on Chicago Avenue an opportunity to leave. (DPOs' 56.1, ¶¶ 137, 139).

The CPD segregated the arrestees by gender, handcuffed and searched them and took them to police stations. (Plfs.' 56.1, ¶ 12.) The CPD took most of the males to the police station located at 727 East 111th Street, and the majority of females to the police station at 5555 West Grand Avenue. (*Id.*) Plaintiffs were processed and placed in holding cells. Almost all Plaintiffs were held for at least 12 hours and many for 24 hours or more. (Plfs.' 56.1, ¶¶ 42, 151, 202, 227, 267, 302, 332, 352, 389, 452.) Plaintiffs allege that their requests to use a telephone were denied. (Plfs.' 56.1, ¶ 120, 148, 305, 333-34, 422-23, 456-58.) On most of Plaintiffs' arrest reports the box is checked indicating that they "refused" the opportunity to make a telephone call. (*Id.*) The arrest reports of

6

the men stated:

> The above subject was arrested for Reckless Conduct in that he
> endangered the bodily safety of citizens by acting in such a reckless
> manner so as to disrupt vehicular traffic and pedestrian traffic. The
> defendant acted with total disregard for the personal safety of
> motorists and pedestrians.

(*See, e.g.,* Plfs.' 56.1, ¶ 153.) The arrest reports of the women stated:

> The above subject along with 1000's of persons endangered the safety
> of others in that they blocked access to a fire station, positioned
> themselves in front of the water pumping station and blocked access
> to the emergency entrance to Northwestern Hospital and refused to
> leave after being ordered to do so by police.

(*See, e.g.,* Plfs.' 56.1, ¶ 231.) Charges against all Plaintiffs were eventually dismissed. (Plfs.' 56.1, ¶ 13.)

## Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. In determining whether a genuine issue of fact exists, a court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. *See Drake v. Minnesota Mining & Mfg. Co.*,

134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted"). An adequate rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

## DISCUSSION

Defendants, as members of the Chicago Police Department, are government officials. Under the doctrine of qualified immunity, "governmental officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified-immunity analysis involves two steps: first, did the alleged conduct violate the Constitution or statutes of the United States and, second, were the constitutional or statutory standards clearly established at the time in question? *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Plaintiffs bear the burden of proving that Defendants violated a clearly established constitutional or statutory protection. *See Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994).

### Claims I and II – § 1983 Unlawful Arrest and Wrongful Imprisonment

An unlawful arrest or wrongful imprisonment claim under § 1983 requires an absence of probable cause to justify the arrest. *See Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) ("Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution"). A police officer has probable cause to make an arrest when the totality of the facts and circumstances within his

8

knowledge would lead a reasonably prudent person to believe that the suspect committed or is committing an offense. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Tangwall v. Stuckey*, 135 F.3d 510, 519 (7th Cir. 1998) (holding that probable cause is "a commonsense determination, measured under a reasonableness standard"). Even if probable cause did not exist to justify the arrest, a law enforcement officer will be immune from liability if "a reasonable police officer could have mistakenly believed that probable cause existed." *Kelley v. Myler*, 149 F.3d 641, 648 (7th Cir. 1998). [The law presumes that an officer can not mistakenly believe that probable cause existed if the clearly established law at the time of the arrest would deem the arrest improper. The law also presumes that officers are aware of clearly established law.]

A "clearly established right to be free from arrest without probable cause" existed at the time CPD officers arrested the marchers. *See Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998). However, identifying the clearly established right "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201; *see Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense"). The parties agree that the cases *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977) and *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), define the scope of the CPD's authority to respond constitutionally to a mass demonstration involving the exercise of First Amendment rights.[5]

---

[5] This Court's determination of whether a right is clearly established begins with Supreme Court and Seventh Circuit precedents. *See Jacobs v. City of Chicago,* 215 F.3d 758, 767 (7th Cir. 2000). No such controlling precedent defines the particular rights asserted by Plaintiffs. Absent controlling precedent, a court may look to all relevant caselaw to determine "whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id.* Because Defendants have not challenged that *Cullinane* and *Dellums* clearly establish the constitutional boundaries of their conduct, the Court

*See also Barham v. Ramsey*, 338 F. Supp. 2d 48 (D.D.C. 2004) (discussing *Cullinane* and *Dellums*

in addressing suits arising from mass arrests in Washington, D.C. in 2002), affirmed in part by

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006).

The Constitution guarantees individuals access to public places, such as streets and

sidewalks, for the purpose of exercising their First Amendment rights. *See U.S. v. Grace*, 461 U.S.

171, 177 (1983). The First Amendment also allows the police to impose reasonable restrictions upon

demonstrations, including the right to "contain or disperse demonstrations that have become violent

or obstructive." *Cullinane*, 566 F.2d at 119; s*ee Forsythe County v. The Nationalist Movement*, 505

U.S. 123, 130 (1992); *Cox v. New Hampshire*, 312 U.S. 569, 574-76 (1941). As to when the police

may contain or disperse a demonstration:

> It is the tenor of the demonstration as a whole that determines
> whether the police may intervene; and if it is substantially infected
> with violence or obstruction the police may act to control it as a unit.
> Where demonstrations turn violent, they lose their protected quality
> as expression under the First Amendment. Confronted with a mob
> the police cannot be expected to single out individuals; they may deal
> with the crowd as a unit. . . .
>
> We do not suggest of course that one who has violated no law may be
> arrested for the offenses of those who have been violent or
> obstructive. As we have seen however the police may validly order
> violent or obstructive demonstrators to disperse or clear the streets.
> If any demonstrator or bystander refuses to obey such an order after
> fair notice and opportunity to comply, his arrest does not violate the
> Constitution even though he has not previously been violent or
> obstructive.

*Cullinane*, 566 F.2d at 120 (D.C. Cir. 1977) (internal citation omitted). Fair notice means "notice

reasonably likely to have reached all of the crowd." *Dellums*, 566 F.2d at 181. Thus, probable cause

---

will not delve into this secondary analysis.

for arrest existed if a marcher engaged in violent or obstructive conduct or if a marcher refused to obey a lawful order to disperse after fair notice and an opportunity to comply. Absent such circumstances, no probable cause existed and Plaintiffs had a clearly established right to be free from arrest.

Defendants argue that the crowd became violent and obstructive when, acting without a permit, they refused to obey police instruction regarding the route for the march. (DPOs' 56.1, ¶¶ 76-116.) In so doing, the marchers blocked and interfered with traffic on Chicago Avenue, blocked a fire station east of Michigan Avenue on Chicago Avenue and blocked emergency access to Northwestern Hospital. (DPOs' 56.1, ¶ 130, 164); *see Cullinane*, 566 F.2d at 115 ("People blocking traffic at a critical intersection may breach the peace as fully as those who hurl stones"). Defendants also cite individual instances of alleged disorderly conduct such as protestors pounding on vehicles, throwing things, surging against police lines and committing vandalism. (DPOs' 56.1, ¶¶ 78, 80, 122, 132-135.) Protestors, for example, surrounded the car of Joshua Drew, a Northwestern Hospital employee, on Chicago Avenue and began shaking and pounding on it. (DPOs' 56.1, ¶¶ 134-35.) Plaintiffs, contrariwise, testified that they observed the marchers commit no disorderly conduct and that none of Plaintiffs engaged in the conduct of which Defendants complain. (Plfs.' 56.1, ¶ 569.) Plaintiffs additionally testified that the marchers did not obstruct traffic or emergency access to Northwestern Hospital or the fire station and, if so, it was because the CPD had forced them to that location. (Plfs.' 56.1 ¶¶ 8-9, 493-97, 511-15, 567, 574.) Consequently, a factual dispute exists as to whether Plaintiffs engaged in any violent or obstructive behavior that would have justified their arrests and whether the demonstration as a whole became so substantially infected with violence or obstruction such that the CPD lawfully could order them to disperse and clear the streets.

11

Assuming that certain marchers committed violent or obstructive acts, the CPD nevertheless must have given other peaceful marchers a lawful order to disperse prior to arresting them. *See Barham*, 338 F. Supp.2d at 58 ("*Dellums* establishes a 'bright line rule' that where a group contains persons who have not been violent or obstructive, police may not mass arrest the demonstration as a group without fair warning or notice and the opportunity to come into compliance and disperse"). In describing their dispersal orders, Defendants rely primarily on "negotiations" that occurred between Command Personnel and march leaders while the demonstrators were near the corner of Oak and Michigan Avenues. (DPOs' 56.1, ¶ 82.) Commanders Griffin and Risley spoke with a protest leader, Andy Thayer, and others. (DPOs' 56.1, ¶ 83.) Commanders Griffin and Risley conveyed Deputy Superintendent Cline's warning to march leaders that they could not march on Michigan Avenue. (DPOs' 56.1, ¶ 84.) The march leaders also were told that they would have to return to Federal Plaza via Lake Shore Drive, disperse or be arrested. (DPOs' 56.1, ¶ 87.) As the marchers began to head back towards Federal Plaza, Deputy Superintendent Cline assigned Commander Griffin to monitor the marchers and make sure that they did not attempt to reach Michigan Avenue. (DPOs' 56.1, ¶¶ 96, 158.) Some marchers disobeyed police commands and rushed passed Commander Griffin towards Michigan Avenue. (DPOs' 56.1, ¶¶ 112-13, 116.) Commander Griffin repeated the earlier warning not to march on Michigan Avenue. (DPOs' 56.1, ¶¶ 92, 103, 107, 111.) These first arrests were mainly people that ran by Commander Griffin towards Michigan Avenue. (DPOs' 56.1, ¶ 126.)

The remaining marchers were surrounded on Chicago Avenue between Michigan Avenue and Mies van der Rohe Way. (DPOs' 56.1, ¶ 117.) Commander Griffin then ordered arrests "based on the order that was given at Oak and Michigan that we were going to arrest people, they weren't

going to be allowed to go on Michigan Avenue, I just decided we're going to have to start making some arrests." (DPOs' 56.1, ¶ 119.) After the initial set of arrests were made, Deputy Superintendent Cline and Chief of Patrol Maurer testified that the CPD gave the other marchers surrounded on Chicago Avenue an opportunity to leave. (DPOs' 56.1, ¶ 137) ("People were asked if they wanted to leave, and those that said yes, they said, you can leave if you walk on the sidewalk, and people started walking to the sidewalk in small group and leaving"); (DPOs' 56.1, ¶ 139) ("Chief of Patrol Maurer told CPD command staff at Chicago and Michigan to pass the message down the chain of command to instruct people that they were to disperse the way they came; that they would be allowed to leave in small groups and that if they did not leave when they were instructed, they would be arrested"). One protestor testified that some marchers just sat in the street after the police informed them to clear the streets or be arrested. (DPOs' 56.1, ¶ 129.)

Each Plaintiff, contrariwise, denies having heard the police give an order to disperse or being given an opportunity to disperse. (Plfs.' 56.1, ¶¶ 17-19, 29-30, 100-07, 135-36, 167, 170, 191-92, 195, 217-18, 237, 241-42, 244-46, 273-74, 280-82, 290, 320, 346, 369-70, 373, 375-76, 383, 439-42, 575.) Plaintiffs testified that march leaders did not communicate to the crowd to return by way of Lake Shore Drive to Federal Plaza, disperse or be arrested. (Plfs.' 56.1, ¶¶ 568-69.) Finally, Plaintiffs testified that no dispersal order was given on Chicago Avenue prior to the CPD arresting marchers in the surrounded area. (Plfs.' 56.1, ¶¶ 522-23, 576.) Based on this testimony, a disputed issue of fact exists as to whether the CPD gave fair notice to disperse and an opportunity for Plaintiffs to comply.

None of the Command Personnel sued in this action gave an order to arrest nor did they physically arrest any of the marchers. (DPOs' 56.1, ¶¶ 162-63, 181, 203-04.) Nevertheless, "[a]n

officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under Section 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Specific to the Command Personnel, for liability to attach for the conduct of a subordinate, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what he might see." *Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003).

Commander Risley and Deputy Superintendent Cline were involved in the negotiations with march leaders at Michigan and Oak. (DPOs' 56.1, ¶¶ 82-95.) Both arrived at Chicago Avenue after the arrests have been initiated. (DPOs' 56.1, ¶¶ 162, 203.) Superintendent Hillard, though not present at the scene, communicated constantly with personnel on the scene. (DPOs' 56.1, ¶¶ 175, 178, 181.) None of the Command Personnel exercised his authority to prevent the arrests. (DPOs' 56.1, ¶¶ 162-63, 181, 203-04.) All Plaintiffs were among the group of marchers surrounded and arrested on Chicago between Michigan and Mies Van Der Rohe except Jodi Gronberg. (Plfs.' 56.1, ¶ 3.) The evidence is in direct dispute at this stage as to whether the marchers were violent and disrupting traffic or whether they were given an order and opportunity to disperse. Given this conflicting evidence and Defendants' acknowledgment that *Cullinane* and *Dellums* clearly established Plaintiffs' rights, questions of material fact exist as to whether each of the Command Personnel had knowledge of facts that reasonably would cause him to believe that the arrests were constitutional. *See Morfin*, 349 F.3d at 1001 ("If the record suggested that [supervisor] had

14

knowledge of facts that would cause him to believe that [the officer] was about to make an unconstitutional arrest but failed to use his authority to stop the violation, his failure would result in liability under § 1983"); *Barham*, 338 F. Supp.2d at 61-62 (question of fact existed whether supervising officer could rely reasonably on information obtained through other law enforcement officials in approving a mass arrest). Likewise, it is a disputed question of material fact whether the Command Personnel had a reasonable opportunity or method by which to intervene and stop any arrests that may have been made of peaceful protesters who may not have been given an order to disperse and an opportunity to peacefully leave. *See Yang*, 37 F.3d at 286.

*Dellums* and *Cullinane* require that the order to disperse be "reasonably likely to have reached all of the crowd." *Dellums*, 566 F.2d at 181. This Court can envision a scenario where an order to disperse could be constructively conveyed. For example, it is undisputed that the CPD Command Personnel made efforts to control the direction of the marchers by communicating with the self-proclaimed leaders of the march. (DPOs' 56.1, ¶¶ 11-13, 59-60, 63-64,83-95.) It is further undisputed that CPD gave a strong visual message to the marchers that they could not march onto Michigan Avenue by establishing the skirmish line of officers and mounted officers at Michigan Avenue. (DPOs' 56.1, ¶¶ 81, 100, 105-06, 116, 161; Plfs.' 56.1, ¶¶ 6, 9, 494-96.) In a scenario where a crowd of thousands of marchers is moving en masse without direction, it may be that Command Personnel's efforts in communicating with march leaders, who were in turn communicating with each other via cell phones and walkie talkies (DPOs' 56.1, ¶ 58), may have been the most reasonable way of attempting to reach this amorphous and moving crowd of marchers. At this stage, however, the facts are disputed between the parties as to whether these negotiations included orders to disperse, whether there were vocal orders to disperse given to peaceful marchers

aside from these conversations, and whether there were violent and disruptive marchers. Based on these disputed facts, it can not be said that as a matter of law, the arrests were justified based on the clearly established law – which as it stands, requires that law enforcement officers must give peaceful marchers an order to leave and then an opportunity to comply with that order. It is factually disputed as to whether marchers, if given such an order, had the opportunity to disperse in the blocked off area of Mies van der Rohe Way. It is possible that a jury may find that CPD's communications with march leaders was an order to disperse reasonably likely to have reached the entire crowd; but the facts leading to that conclusion must be determined by a jury as do the facts regarding the marcher's conduct and the marcher's ability to comply with any order to disperse.

The Officers contend that they did not violate any clearly established right, but if so, they were only following orders. The Officers are not immune from liability merely because they were following orders. *See Busche v. Burkee*, 649 F.2d 509, 517 (7th Cir. 1981) ("We reject this broad conclusion to the extent it may imply that an individual is relieved of personal responsibility for perpetrating unlawful acts against another simply because he is acting as an agent or subject to a superior's orders"). Again, the law require that an officer have knowledge of clearly established law such that he must know or should have known that he was violating an individual's constitutional rights in executing a supervisor's order. *See J.H.H. v. O'Hara*, 878 F.2d 240, 244 n. 4 (8th Cir. 1989); *Woods v. City of Michigan City*, 940 F.2d 275, 280-81 (7th Cir. 1991) (holding that officers who reasonably acted pursuant to judicially promulgated bond schedule and who could not have known that it violated plaintiff's constitutional rights were immune). In addition, the responsibility to intervene and prevent an unlawful arrest applies equally to supervisory and nonsupervisory officers. *Yang*, 37 F.3d at 285.

16

Under the state of the clearly established law as it stands in *Cullinane* and *Dellums*, the Officers are charged with the knowledge that each marcher had a right to exercise his First Amendment rights, free from arrest, unless the marcher engaged in violent or obstructive conduct or refused to obey a lawful order to disperse after fair notice was given to him and he was given an opportunity to comply with that order. Thus, absent a reasonable belief that such circumstances existed, the Officers had a duty to refuse to arrest the marchers or to intervene and prevent the arrests. The law requires that an Officer cannot simply assume that because he is given an order to arrest that probable cause must have existed. *See Busche*, 649 F.2d at 517. Here, once again, it is disputed that Plaintiffs were violent or obstructive or were given a lawful order to disperse, and therefore it must be left to a jury to decide whether the Officers acted reasonably or whether they knew or should have known that arresting Plaintiffs would violate Plaintiffs' constitutional rights. *See Woods*, 940 F.2d at 280-81. Similarly, there are disputed issues of fact as to whether the Officers had a reasonable opportunity or method by which to intervene and prevent the arrests. *See Yang*, 37 F.3d at 286.

**Claim III – § 1983 Violation of First Amendment Rights**

"[T]he government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotations omitted). Plaintiffs initially argue that Defendants acted to suppress the content of their anti-war speech. Plaintiffs cite the following evidence as support: (1) an unknown officer's statement to Plaintiff Beal that "[y]ou'll be coming

17

back tomorrow, aren't you" (Plfs.' ¶ 103); (2) that an unknown officer told Plaintiff Gordon to pledge alliance to President Bush (Plfs.' ¶ 37); (3) that Plaintiff Cremona had four anti-war pins confiscated and never returned (Plfs.' ¶ 385); and (4) that police titled their response to the demonstration "Liberty Shield." From this evidence, no reasonable juror could find that Defendants' actions were motivated by a desire to suppress the content of Plaintiffs' speech. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is proper when no reasonable juror could find for the nonmovant).

Plaintiffs' First Amendment claim must go to the jury, however, on the disputed issues of whether Defendants' restrictions on the time, place and manner of Plaintiffs' speech were reasonable, narrowly tailed to serve a significant governmental interest, and left open ample alternative channels for communication of the information. These questions are intertwined with the alleged Fourth Amendment violations and preclude judgment as a matter of law. *See Barham*, 338 F. Supp.2d at 58-59.

### Claims VII, VIII and IX – Violations of Illinois Constitution and State Law False Arrest and False Imprisonment

Defendants allegedly denied Plaintiffs their state constitutional rights to be secure in their persons, to be free from unreasonable searches and seizures, to speak, write and publish freely; to assemble in a peaceful manner, and to due process of law and equal protection of the laws, as provided by the Illinois Constitution, Article 1, sections 1, 2, 4, 5 and 6. False arrest and false imprisonment involve the unlawful restraint of an individual's personal liberty, claims to which an arrest based upon probable cause would be a complete defense. *See Meerbrey v. Marshall Field & Co.*, 545 N.E.2d 952, 955 (1989). Additionally, the Illinois Local Governmental and Governmental

Employees Tort Immunity Act provides: "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 2-202. The statute defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm, or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. Whether the conduct is sufficiently willful and wanton is ordinarily a question of fact for the jury and rarely should be ruled upon as a matter of law. *See Mostafa v. City of Hickory Hills*, 677 N.E.2d 1312, 1319 (1997). For the reasons that justified denying qualified immunity under Claims I, II and III, a reasonable juror could conclude Defendants acted willfully and wantonly or with deliberate indifference to Plaintiffs' rights. *See Payne for Hicks v. Churchich*, 161 F.3d 1030, 1041 n. 13 (7th Cir. 1998) (willful and wanton standard is "remarkably similar" to the deliberate indifference standard).

**Claim X – State Law Malicious Prosecution**

To make a claim for a malicious prosecution, a plaintiff must prove: (1) the commencement or continuation of a legal proceeding by the defendants; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff. *See Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). Like wrongful arrest and imprisonment, probable cause bars a malicious prosecution claim. *See Kincaid v. Ames Dept. Stores, Inc.*, 670 N.E.2d 1103, 1109 (Ill. App. 1996). Malice is present when a prosecution is initiated for any reason other than to bring a party to justice. *See Rodgers v. People's Gas Light and Coke Co.*, 733 N.E.2d 835, 842 (2000). A lack of probable cause does not itself show malice, but a jury may infer malice from the lack of probable cause if there is

19

no other credible evidence which refutes that inference. *Id.* Assuming the elements above are met, "[l]iability for malicious criminal prosecution is not confined to situations where the defendant signed a complaint against the plaintiff. Rather, liability extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all of the elements of the tort are present." *Id.*

Plaintiffs have not shown that Superintendent Hillard, Commander Risley or the Officers played a significant role in causing their prosecutions. Superintendent Hillard's alleged "approval of the arrests," without more, did not materially advance the prosecution of the charges. As to Commander Risley, Plaintiffs cite his statements in a supplemental arrest and prosecution report that the crowd was "hostile" and "highly agitated." (Plfs.' 56.1 ¶ 483.) Plaintiffs do not otherwise challenge the truth of the information Commander Risley provided to the prosecutors. Commander Risley's subjective statements as to the tenor of the crowd are not false information. *See, e.g., Quiroz v. Hartgrove Hosp.*, 1999 WL 281343, *15 (N.D. Ill. 1999) (statements that plaintiff was "incompetent" and "stupid" were not capable of being proven true or false as they are inherently subjective). The Officers' role in Plaintiffs' prosecution was limited to appearing in court ready to testify. Officers Bilyj, Herrera and Lamperis did not sign the allegedly false arrests reports against Plaintiffs. (Plfs.' 56.1 ¶¶ 88, 298, 354, 398, 432, 463.) Also, while the Officers may have appeared in court prepared to testify against Plaintiffs, the Officers never testified and it is not certain that they would have given false testimony if they had been put on the stand. (Plfs.' 56.1 ¶¶ 127, 310.) Viewing the evidence in the light most favorable to Plaintiffs, the actions of Superintendent Hillard, Commander Risley and the Officers did not play a significant role in causing the prosecutions of Plaintiffs.

20

According to Plaintiffs, Deputy Superintendent Cline's decision regarding the offenses to be charged in the arrest reports represented a significant step in the prosecution of the charges. (Plfs.' 56.1 ¶¶ 542, 547.) Yet, when Deputy Superintendent Cline ordered the complaints to be filed against those individuals arrested on the scene, he did so with the understanding that the individuals to be arrested had been violent, disruptive, had blocked traffic, or had not complied with police orders – information that he received from his other commanding officers on the street. (DPOs' 56.1, ¶¶ 131, 166.) "A person who unwittingly gives a prosecuting officer false information of another person's alleged crime is not liable for malicious prosecution, unless the person takes an active part in instituting criminal proceedings, by requesting, directing, or pressuring the prosecuting officer into instituting the proceedings..." *Allen v. Berger*, 784 N.E.2d 367, 370 (Ill. App. 2002). Accordingly, the malicious prosecution claim against Deputy Superintendent Cline is dismissed because no further act after the arrest of the marchers – which may or may not have been based on probable cause according to the disputed facts at this stage – was committed that could constitute improper conduct in furtherance of the prosecution. *See, e.g., Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996) (allegation of arrest without probable cause without any further improper acts is insufficient to constitute malicious prosecution).

**Claims V and XI – § 1983 and State Law Civil Conspiracy**

A conspiracy is "[a] combination of two or more persons acting in concert to commit an unlawful act, or . . . a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981) (internal quotations omitted).

21

> In order to establish the existence of a conspiracy . . . [t]he conspirators must act with a single plan, the general nature and scope of which is known to each would-be conspirator. The agreement may be inferred from circumstantial evidence, but only if there is sufficient evidence that would permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives.

*Hernandez v. Joliet Police Dept.*, 197 F.3d 256, 263 (7th Cir. 1999) (internal citations omitted); *see Rodgers*, 733 N.E.2d at 843 ("The conspiracy may be inferred if parties pursue the same object by common means, one performing one part and another performing another part").

The object of Defendants' alleged conspiracy was to arrest Plaintiffs in violation of their First and Fourth Amendment rights. Since none of the Command Personnel or Officers sued in this action gave an order to arrest Plaintiffs nor did they physically arrest them, their liability arises from a failure to act. (DPOs' 56.1, ¶¶ 162-63, 181, 203-04.) While Plaintiffs may rely on circumstantial evidence, they nonetheless must prove an agreement and "merely failing to prevent the unlawful conduct of one party or assisting an unlawful actor does not necessarily constitute a conspiracy." *Webb v. Local 73, Service Employees Intern., AFL-CIO*, 2002 WL 31497352, *2 (N.D. Ill. 2002). The Command Personnel may have failed in their duty to prevent unlawful conduct among their subordinates and the Officers may have assisted in carrying out unlawful arrests, but such conduct does not demonstrate their complicity in a single plan with a common and understood goal. Viewing the evidence in the light most favorable to Plaintiffs, no reasonable juror could infer that Defendants reached "a meeting of the minds" to violate Plaintiffs' constitutional rights. *See Tierney v. Vahle*, 304 F.3d 734, 742 (7th Cir. 2002) (holding that "a conspiracy is an agreement, and a spontaneous response to information furnished one is not action pursuant to an agreement"). Accordingly, Defendants are entitled to judgment as a matter of law on Plaintiffs' civil conspiracy claim.

22

**Claim VI – § 1983 *Monell* Pattern and Practice**

A municipality is liable under § 1983 when its policy or custom results in a constitutional injury to the plaintiff. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978) ("[I]t is when the execution of a government's policy or custom, whether made by lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983"). Genuine issues of material fact exist as to whether Plaintiffs suffered a constitutional injury, so the question becomes whether the injury resulted from a municipal policy or custom. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997) (a municipality cannot be liable unless plaintiff first demonstrates that he suffered a constitutional injury). Plaintiffs can prove a municipal policy or custom by demonstrating either: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) the act of a person with final policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). Plaintiffs do not argue that enforcement of any express municipal policy deprived them of their constitutional rights.[6] Rather, Plaintiffs assert that their injury resulted from a municipal custom or the decision of a policymaker for the City.

**1. Municipal Custom**

A custom is a widespread practice that, although not authorized by written law or express

_____

[6] Under General Order 10-20, it is the City's official policy that CPD members "may not investigate, prosecute, disrupt, interfere with, harass, or discriminate against any person engaged in First Amendment conduct for the purpose of punishing, retaliating, or preventing the person from exercising his or her First Amendment rights."

municipal policy, is so permanent and well settled that it applies with the force of law.  *See Monell*, 436 U.S. at 690-691 (customs, in contrast to official policies, do not receive "formal approval through . . . official decisionmaking channels").  In accord with this definition, a custom cannot be established through a single unconstitutional act by a municipal employee.  *See Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) ("The word 'custom' generally implies a habitual practice or a course of action that characteristically is repeated under like circumstances").  Plaintiffs' only evidence of a municipal custom comes from the events that occurred on March 20, 2003.  Plaintiffs argue that the events of March 20, 2003 are not a single incident but rather a series of hundreds of individual false arrests.  Plaintiffs' position is inconsistent with precedent and the underlying rationale for a municipality's liability for its custom.

Courts have defined a custom as a practice that is "persistent," "widespread," "habitual," "permanent," "well-settled" and "entrenched."  *Monell*, 436 U.S. at 691; *McTigue*, 60 F.3d at 382; *Gray v. Dane County,* 854 F.2d 179, 183 (7th Cir. 1988); *Jones*, 787 F.2d at 204.  These terms are inconsistent with finding a custom based upon events that occurred on just one day.  Next, a custom creates municipal liability because a municipality fairly may be at fault for its employees' actions that it has countenanced or approved.  *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)  ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, . . . considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation"); *Powe v. City of Chicago*, 664 F.2d 639, 649 (7th Cir. 1981) ("[A] municipality may be cast in damages only for its own acts or omissions, and a municipality 'acts' by establishing or countenancing policies or practices which its employees are

expected to follow in performing their duties"). When the unconstitutional acts all occur on one day, a municipality cannot be seen as having countenanced or approved the practice.

Plaintiffs argue that nonetheless the City is liable because it failed to train properly its officers to respond to a mass demonstration of First Amendment rights. The City cites considerable evidence of its training for police officers generally and with regard to demonstrations in particular. (City's 56.1, ¶¶ 15-45.) But it is Plaintiffs' burden to provide evidence that creates a genuine issue of material fact regarding the City's failure to train. *See Celotex Corp.*, 477 U.S. at 322 (plaintiffs must "make a showing sufficient to establish the existence of an essential element on which [the plaintiffs] will bear the burden of proof at trial, or else summary judgment for the opposing party is proper"); *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 235 (7th Cir. 1995) (defendant was under no duty to negate an element of plaintiff's claim, plaintiff bore burden of coming forward with evidence that would prove its claim). Plaintiffs' unsupported conclusion that "it is clear that the arresting officers were not trained and this contributed to the constitutional violations," without any evidence from the record, is not adequate to meet their summary judgment burden. *See Weeks v. Samsung Heavy Industries Co., Ltd.*, 126 F.3d 926, 934 (7th Cir. 1997) (holding that conclusory allegations without factual support cannot defeat a motion for summary judgment). Moreover, "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). And "a single instance of allegedly unconstitutional conduct does not demonstrate a municipality's deliberate indifference to the constitutional rights of its inhabitants." *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000). The CPD's

25

response to the protest march on March 20, 2003, as a single instance, does not demonstrate the City's deliberate indifference. Consequently, Plaintiffs have failed to demonstrate a genuine issue of material fact that the City had a custom that resulted in a violation of their constitutional rights.

### 2. Municipal Policymaker

Unlike the practices of a municipality's lower-level employees, the single act of high-level policy maker can render a local government liable under § 1983. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 470 (1986) ("Municipal liability may be imposed for a single decision by municipal policy makers under appropriate circumstances"). Plaintiffs contend that the Command Personnel had policymaking authority. Whether an official has "final policymaking authority" over a certain issue is a question answered by state or local law. *See St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *Kujawski v. Bd. of Com'rs of Bartholomew Cty, Ind.*, 183 F.3d 734, 738 (7th Cir. 1999) ("[O]ur task is to determine whether the official in question was a final policymaker for the local government 'in a particular area, or on a particular issue'"), quoting *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997). Generally speaking, the City Council and Police Board set municipal policy for the CPD. *See Auriemma v. Rice*, 957 F.2d 397, 399-400 (7th Cir. 1992). Plaintiffs have not identified any authority for CPD's Command Personnel to "countermand the statutes regulating the department" or adopt rules for the conduct of the department. *Id.* at 400; *see Killinger v. Johnson*, 389 F.3d 765, 772 (7th Cir. 2004) ("Plaintiff's municipal liability theory fails because he has not identified any state or local positive law, or custom having the force of law, that grants either the chief or the mayor authority to adopt rules that are relevant to this case"). Accordingly, to the extent that Command Personnel or Officers operated contrary to the express policy and practice of the City, no municipal liability is created. *See Auriemma*, 957 F.2d at 401.

26

**Claims Against Defendants Doe and Roe (IV, XIV and XV) and of Respondeat Superior (XII) and Indemnification (XIII)**

Plaintiffs Caporusso, Chapman-Kramer, Dewars and Gronburg assert claims for excessive force and assault and battery, and all Plaintiffs assert claims for unreasonable and punitive conditions of confinement against unknown officers.[7] These unknown officers are identified in the Complaint with the placeholders Defendants Doe and Roe. For the reasons explained in this Court's ruling on Defendants' Partial Motion to Dismiss State Law Claims Against Newly Identified Defendants in the related case of *Vodak v. City of Chicago*, all Plaintiffs' claims – state and federal – against Defendants Doe and Roe are dismissed as barred by the statute of limitations. *See* 2006 WL 1049736, *3 (N.D. Ill. April 19, 2006), citing *Baskin v. City of Des Plaines*, 138 F.3d 701, 704 (7th Cir. 1998) (affirming dismissal of complaint as untimely where plaintiff did not add defendant officer to replace a John Doe defendant until after the statute of limitations had expired). Also consistent with this Court's prior ruling, Plaintiffs' failure to name specific CPD officers before the passing of the statute of limitations does not bar relief against the City under 745 ILCS § 10/9-102 or the doctrine of respondeat superior. *Id.* at *5, citing *McCottrell v. City of Chicago*, 135 Ill. App. 3d 517, 519, 481 N.E.2d 1058, 1059 (1st Dist. 1985) (Illinois courts have "long recognized that in an action by a third party based on injuries caused by the negligence of the servant, the servant is not a necessary party in an action against the master") Thus, while Plaintiffs are time barred from pursuing any claims against Defendants Doe and Roe, Plaintiffs still may obtain relief on their claims of respondeat superior and indemnification from the City of Chicago if they can prove that Defendants Doe and Roe would be liable for excessive force, assault and battery or unreasonable and

---

[7] Plaintiffs have cited no evidence to support liability against the Command Personnel or Officers on any of these claims.

27

punitive conditions of confinement. The City is potentially liable under respondeat superior or for indemnification on the surviving causes of action against the Command Personnel and the Officers as well.

### Conclusion and Order

Wherefore, Defendant Cline's Motion for Summary Judgment is granted in part and denied in part. Defendant Risley's Motion for Summary Judgment is granted in part and denied in part. Defendant Hillards' Motion for Summary Judgment is granted in part and denied in part. The Defendant Officers' Motion for Summary Judgment is granted in part and denied in part. The City's Motion for Summary Judgment is granted in part and denied in part. Plaintiffs' Motion to Strike Certain Exhibits and Allegations From Defendants' Summary Judgment Materials and Plaintiffs' Motion to Strike Additional Materials Provided With Defendants' Reply and Supplement to Motion to Strike Radio Transmissions are granted in part and denied in part consistent with this opinion. So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: March 30, 2007

28